

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-19-00202-CV
_____

IN RE NAVAJO NATION, RELATOR

An Original Proceeding
Arising From Proceeding in the 99th District Court
Lubbock County, Texas
Trial Court No. 2017-527,784; Honorable William C. Sowder, Presiding

September 10, 2019

## ORIGINAL PROCEEDING

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

By this original proceeding, Relator, the Navajo Nation, seeks a writ of mandamus to compel Respondent, the Honorable William C. Sowder, to grant its motion to transfer jurisdiction over the underlying parent/child termination proceeding[1] to the Navajo Nation's Tribal Court in Arizona, pursuant to the provisions of the Indian Child Welfare

---

[1] See TEX. FAMILY CODE ANN. §§ 161.001-161.211 (West 2014 & West Supp. 2018).

Act of 1978 ("ICWA").[2]  Specifically, the Navajo Nation challenges the trial court's determination that "good cause" existed, within the meaning of the ICWA, not to transfer the proceeding to the Navajo Nation's Tribal Court.  *See* 25 U.S.C.S. § 1911(b) (2019).[3]  Because the Navajo Nation is not entitled to the relief requested, we deny its petition.

## BACKGROUND

There are three children at issue in the underlying termination proceeding: S.R. (a female child born in 2017), A.R. (a male child born in 2015), and H.H. (a female child born in 2008).[4]  The mother's initials are also A.R.  The purported fathers of the children were served by publication and have not participated.  In October 2017, the Texas Department of Family and Protective Services (the "Department") investigated a complaint of physical abuse when neighbors heard A.R. slap H.H. indoors.  The Department subsequently

---

[2] 25 U.S.C.S. §§ 1901-1963 (2019).  We note that portions of the ICWA were recently challenged in the United States Court of Appeals for the Fifth Circuit.  *See Brackeen v. Bernhardt*, No. 18-11479, 2019 U.S. App. LEXIS 23839 (5th Cir. Aug. 9, 2019).   In reversing the federal district court; *see Brackeen v. Zinke*, 338 F.Supp.3d 514 (N.D. Tex. 2018), the Fifth Circuit found the challenged provisions constitutional.  *See Brackeen*, 2019 U.S. App. LEXIS 23839, at *41-55. Because the constitutionality of the ICWA was not challenged or addressed in the trial court below, we do not reach any issue related to the constitutionality of the ICWA in this appeal.  Nor is this court's opinion to be read to express any opinion as to *Brackeen* or the constitutionality of the ICWA.

Throughout the remainder of this opinion, we will cite provisions of the ICWA simply as "25 U.S.C.S. § ____" and "25 U.S.C.S. section ____."

[3] 25 U.S.C.S. § 1911(b) provides as follows:

**(b) Transfer of proceedings; declination by tribal court.**  In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, that such transfer shall be subject to declination by the tribal court of such tribe.

[4] To protect the privacy of the parties, we refer to them by their initials.  *See* TEX. FAM. CODE ANN. § 109.002 (West Supp. 2018).  *See also* TEX. R. APP. P. 9.8(b).

discovered H.H. was not attending school, there was no furniture in the house on which the children could sleep, and the mother tested positive for methamphetamine and marijuana. On October 23, 2017, the Department filed its original petition for the protection of the children and among other things, sought the termination of A.R.'s parental rights to the children under multiple provisions of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (K), (N), and (O) (West Supp. 2018).

On October 25, 2017, the Department filed its *Notice of Pending Custody Proceeding Involving Indian Child* and shortly thereafter received a letter from the United States Department of the Interior – Bureau of Indian Affairs indicating that the Navajo Nation's Regional Office had received the notice and were properly notified of the pending proceedings.[5] On March 8, 2018, the matter was scheduled for a final hearing before Associate Judge Kara L. Darnell, to be held on July 26. During the months of May and June, A.R. tested positive for methamphetamine and amphetamine. She also refused the requests for two other drug tests. In June, the Navajo Nation informed the Department that it was unable to verify the children's eligibility for tribal membership. The Department was told by the Navajo Nation Regional Office that the intake would be closed and that the matter would be considered as a referral for record information only. On July 26, the final hearing was reset for October 18, 2018.

In August, the Navajo Nation advised the Department that the children were enrolled as members of the Navajo Nation and eligible for ICWA services. The Navajo

---

[5] The notice advised the Navajo Nation that the proceedings "MAY HAVE SIGNIFICANT CONSEQUENCES INVOLVING THE CHILDREN INCLUDING THE POSSIBILITY OF A LOSS OF CUSTODY OR TERMINATION OF PARENTAL RIGHTS."

Nation also intervened in the proceedings and assigned Delphine Segodi, the Navajo Nation's senior social worker, as its caseworker to receive all court filings and participate in the proceedings. In September, A.R. failed to attend another drug test. In anticipation of the October final hearing, the Department filed a *Permanency Report* indicating that the Navajo Nation offered no relatives for possible placement but would continue searching and the Court Appointed Special Advocate ("CASA") filed a report recommending termination of A.R.'s parental rights due to her continued drug use, her failure to address the reasons for the children's removal, her failure to establish a consistent place of residence, her failure to maintain consistent employment, her failure to engage in services provided, and her lack of involvement with the children. On October 11, the trial court issued a second order resetting the final hearing for January 3, 2019.

During this period of delay, the Department continued to be in communication with the Navajo Nation regarding any possible placement; however, Segodi reported that the Navajo Nation was unable to locate any relatives or foster families on the reservation willing to take three children. On December 13, Segodi reaffirmed that the Navajo Nation had no options and supported placement of the children with the foster parents who had cared for them since the termination proceedings were initiated. On January 3, 2019, in order to accommodate Segodi who was ill and unable to participate, the trial court issued a third order resetting the final hearing for February 14, 2019.

On February 12, 2019, the Department filed its *Permanency Report* with the trial court indicating that it was in contact with the Navajo Nation who had reported that it had no relatives or foster families on the reservation and were in agreement with the Department's continuing efforts to permanently place the children with their foster

4

parents.  On February 14, 2019, the trial court convened the final hearing with all parties present.  A.R. began testifying in the morning and resumed her testimony after lunch.   In the middle of the afternoon, Segodi interrupted the proceedings to speak to A.R.  After speaking with the mother, Segodi made an oral motion to transfer jurisdiction over the proceedings to the Navajo Nation's Tribal Court in Arizona.  At the time of the motion, Segodi had exhausted the Navajo Nation's efforts to look for placement with family members and there was not an opportunity for placement or adoption with other members of the Navajo Nation.

On March 25, 2019, the trial court issued its order denying the Navajo Nation's motion to transfer jurisdiction, finding that good cause existed to hear the proceedings in Texas.  Associate Judge Darnell noted that the final hearing had been convened and the mother was testifying when the motion was made, proceedings were at an advanced stage, and the evidence necessary to decide the case could not be adequately presented in the Navajo Nation's Tribal Court in Arizona without undue hardship to the parties and the witnesses.  A.R. subsequently moved for a *de novo* hearing on the denial of the motion.

On April 17, 2019, a *de novo* hearing was convened by the Honorable William C. Sowder.  The State's evidence established that during the proceedings, A.R. and one child had received services from therapists since the removal.  Other providers rendered services under the service plan and treated A.R. and/or the children, such as the CASA,[6]

---

[6] The CASA team leader testified that the CASA does not have the ability to participate in a hearing in Arizona due to jurisdictional issues.  As the children's guardian ad litem in the proceedings, the team leader also testified that the CASA needed to represent the children's best interests at any hearing.

Starcare,[7] and mental/substance abuse counselors. A.R. also received addiction treatment, was drug tested, and attended AA/NA meetings with sponsors. During the nineteen months the proceedings had been pending prior to the motion to transfer, A.R. resided in Lubbock, Texas, the removal occurred in Lubbock, and all the mother's and/or children's service providers were in Lubbock.

The Department testified there was no mechanism for the Department to pay providers to attend a hearing located in Arizona and any mechanism for the Department's caseworker to attend would be limited. The Department proposed that if Segodi was unable to personally attend the termination proceedings, she could continue to participate telephonically. In addition, arrangements could be made so that she could receive all documents through mail or email. The Department also maintained that good cause to deny the transfer existed because the stage of the proceedings was advanced, i.e., the final hearing had been continued at least three times, with the final hearing having already commenced and a portion of the testimony having already been taken. Furthermore, the children had been living in the same household with foster parents approved by Navajo Nation and the foster parents were in the process of adopting the children.

Segodi testified that although the Navajo Nation has an adoption unit and families were recruited, there were no placements available within the Navajo Nation. No homes were available primarily because most families wanted only a single child, not three children. She testified that the motion to transfer the proceedings was made in order for the Navajo Nation to be able to make its own placement and that she had orally moved

---

[7] Starcare is a health system providing services for adults, children, and adolescents who have a diagnosis of mental illness, developmental disabilities, or substance abuse.

to transfer jurisdiction to the Navajo Nation's Tribal Court during the final hearing because she specifically wanted to avoid termination of A.R.'s parental rights. She proposed that the Department and its service providers could participate telephonically in any further proceedings before the Navajo Nation's Tribal Court in Arizona.

On April 30, 2019, the trial court issued its amended order denying the Navajo Nation's motion to transfer jurisdiction. The trial court found good cause to deny the motion because the evidence necessary to decide the case could not be adequately represented in the Navajo Nation's Tribal Court without undue hardship to the parties and the witnesses. The trial court also found that the vast majority of the witnesses, including caseworkers, counselors, and therapists, live in and around Lubbock. In addition, the trial court determined that telephonic testimony before the Navajo Nation's Tribal Court would be insufficient for a fact finder to be able to make necessary reliability and credibility determinations. The trial court specifically found that the Navajo Nation received timely notice of the proceedings and "the lateness of the proceeding" could be considered in reaching its decision. The trial court also stated that in making its decision, it did not consider any factor regarding the propriety or effectiveness of the practices and rules of the Navajo Nation's Tribal Court, the best interests of the children, or the stage of the proceedings at which time the motion to transfer was initially made. The Navajo Nation's request for a writ of mandamus followed.

STANDARD OF REVIEW

Mandamus is an extraordinary remedy granted only when the relator can show that (1) the trial court committed a clear abuse of discretion and (2) no adequate appellate remedy exists. *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig.

7

proceeding) (citing *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992) (orig. proceeding)). An abuse of discretion occurs when a trial court's ruling is arbitrary and unreasonable, made without regard for guiding legal principles or supporting evidence. *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d at 712. Similarly, a trial court abuses its discretion when it fails to analyze or correctly apply the law. *Id.* (citing *In re Southwestern Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007) (orig. proceeding)).

The Texas Supreme Court has held that mandamus review is appropriate in child custody cases where there is a jurisdictional dispute*. Geary v. Peavy*, 878 S.W.2d 602, 603 (Tex. 1994) (orig. proceeding). Moreover, the Texas Supreme Court has frequently held that an appeal is inadequate to protect the rights of children and parents in family law situations. *See Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 160 (Tex. App.—Houston [14th Dist.] 1995, orig. proceeding); *Hutchings v. Biery*, 723 S.W.2d 347, 350 (Tex. App.—San Antonio 1987, orig. proceeding). "Justice demands a speedy resolution of child custody and child support issues." *Proffer v. Yates,* 734 S.W.2d 671, 673 (Tex. 1987).

### THE ICWA

The ICWA provides for a dual jurisdictional scheme. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989). *See* § 1911(b). First, the Act attempts to protect the welfare of Indian families by giving exclusive jurisdiction to tribal courts in any child custody proceeding involving an Indian child who resides or is domiciled within the tribe's reservation. *Holyfield*, 490 U.S. at 36. This protection is codified in section 1911(a) which states as follows:

8

> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

§ 1911(a).

Under the ICWA, however, state courts are not completely divested of jurisdiction over children covered by that Act. *Kiowa Tribe of Oklahoma v. Lewis*, 777 F.2d 587, 591 n.4 (10th Cir. 1985), *cert. denied*, 479 U.S. 872, 107 S. Ct. 247, 93 L. Ed. 2d 171 (1986). Section 1911(b) creates concurrent jurisdiction in the case of children not domiciled on the reservation with a presumption in favor of tribal court jurisdiction. *Holyfield*, 490 U.S. at 36.

Thus, although state courts exercise jurisdiction concurrently with tribal courts with respect to Indian children who are not domiciled on their tribe's reservation, a state court must defer to the tribal court unless: (1) either parent objects; (2) the tribe declines the transfer; or (3) "good cause" is shown for the retention of state jurisdiction. *See* § 1911(b). *See also Holyfield*, 490 U.S. at 36. If there is no objection by a parent and no refusal by the tribe to accept jurisdiction, as here, the determination of whether the proceeding should be transferred turns on the issue of whether "good cause" exists to deny the transfer. *See* § 1911(b).

Here, there is no dispute whether these are "child custody proceedings" to which the ICWA applies. The children are "Indian children" within the meaning of the ICWA, they do not reside on the reservation, a parent has not opposed the Navajo Nation's

9

motion to transfer, and the Navajo Nation has agreed to accept jurisdiction. Therefore, the determinative issue in this appeal is the application of the "good cause" exception, allowing a trial court to deny the transfer of jurisdiction.

Determining whether good cause exists to retain jurisdiction is a matter within the trial court's discretion. *Mejia*, 906 S.W.2d at 163. A good cause determination is necessarily made on a case-by-case basis, after consideration of all the facts and circumstances involved, and the burden of establishing good cause not to transfer jurisdiction to the tribal court is on the party opposing the transfer. *Id.* (citations omitted).

The ICWA does not define the term "good cause," does not establish a procedure for determining whether good cause exists and does not suggest how a good cause determination is reviewed on appeal. The legislative history of the ICWA states that the use of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. *Chester County Dep't of Social Servs. v. Coleman,* 372 S.E.2d 912, 914 (S.C. Ct. App. 1988) (citing H.R. Rep. No. 1386, 95th Cong. 2nd Ses. 21, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 7530, 7544). The primary sources of aid in the interpretation and application of the ICWA are the interpretive guidelines issued by the Bureau of Indian Affairs ("BIA"). Although not binding, in that they are interpretive rather than legislative in form, the interpretations in the BIA Guidelines should be given important significance. *Mejia*, 906 S.W.2d at 164 (citations omitted).

The current version of the BIA Guidelines was issued in 2016. U.S. Dep't of the Interior, Bureau of Indian Affairs, *Guidelines for Implementing the Indian Child Welfare*

*Act* (Dec. 2016) ("2016 BIA Guidelines").[8]  The 2016 BIA Guidelines do not provide any examples of what constitutes good cause, but instead, set out a list of prohibited grounds for finding good cause.  2016 BIA Guidelines § F.5 at 49.  *See* 25 C.F.R. § 23.118 (2019).[9]

The 2016 BIA Guidelines also explain that the legislative history indicates that this provision is intended to permit a state court to apply a modified doctrine of *forum non conveniens*, in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, and the tribe are fully protected.  2016 BIA Guidelines § F.4 at 48-49.  "[T]he 'good cause' determination whether to deny transfer to Tribal court should address which court is *best positioned* to adjudicate the child-custody proceeding, not predictions about the outcome of that proceeding."  2016 BIA Guidelines § F.5 at 49. (Emphasis added).

---

[8] *See*: https://bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf (last visited September 10, 2019).

[9] 25 C.F.R. § 23.118(c) provides as follows:

In determining whether good cause exists, the court must not consider:

(1) whether the foster-care or termination-of-parental-rights proceeding is at an advanced stage if the Indian child's parent, Indian custodian, or Tribe did not receive notice of the child-custody proceeding until an advanced stage;

(2) whether there have been prior proceedings involving the child for which no petition to transfer was filed;

(3) whether transfer could affect the placement of the child;

(4) the Indian child's cultural connections with the Tribe or its reservation; or

(5) socioeconomic conditions or any negative perception of Tribal or BIA social services or judicial systems.

When the Yavapai-Apache Tribe sought to transfer an Indian child custody proceeding from Texas to Arizona, the *Mejia* court applied a modified *forum non conveniens* test to determine whether a tribal court was an inconvenient forum under the ICWA. *Mejia*, 906 S.W.2d at 165-68.[10] The *Mejia* court determined that "good cause" existed to deny the motion where all the evidence and witnesses necessary for a custody determination were in Texas. *Id*. at 168.

Here, the Department's evidence at the *de novo* hearing established that the mother and children have, at a minimum, lived in Lubbock throughout the proceedings which had lasted in excess of nineteen months. The removal proceedings occurred in Lubbock. All service providers for the mother and/or the three children were also in Lubbock, and all the Department's caseworkers were in Lubbock and/or the surrounding area. In addition, if the proceeding were transferred to Arizona, there is no mechanism for the Department to bear the expense of having service providers attend and any reimbursement for Department employees would be limited. Thus, as in *Mejia*, all material witnesses and evidence necessary for the custody proceedings to go forward are in Texas.

The Navajo Nation asserts that any witnesses necessary for these proceedings to continue before the tribal court could attend telephonically if the proceedings were transferred. However, the burden of participating telephonically would be better borne by

---

[10] "*Forum non conveniens*" generally applies when "an appropriate forum—even though competent under the law—may divest itself of jurisdiction if, for the convenience of the litigants and the witnesses, it appears that the action should proceed in another forum in which the action might also have been brought." Black's Law Dictionary 680-81 (8th ed. 2004). *See also* TEX. CIV. PRAC. & REM. CODE. ANN. § 71.051 (West Supp. 2018). The doctrine is modified so that the state court must also consider and protect the rights of the Indian child and the tribe in its review. *Mejia,* 906 S.W.2d at 165 (collected cases cited therein).

the Navajo Nation as opposed to bringing all witnesses and evidence in Texas to Arizona or requiring them to participate telephonically. The Navajo Nation's representative was involved early in the proceedings, appeared telephonically during hearings, and received all Texas court filings, documents, and evidence. Further, as the trial court noted, having material witnesses appear telephonically would make credibility and reliability determinations difficult, or impossible, for the fact finder. The Navajo Nation also asserts that it intends to place the children in services and seek to establish a guardianship for the children. However, per the 2016 BIA Guidelines, the trial court was constrained from considering whether the transfer could affect the placement of the children. 2016 BIA Guidelines § F.5 at 49. *See* 25 C.F.R. § 23.118(c)(3) (2019).

The 2016 BIA Guidelines state that the "good cause" determination whether to deny transfer to a tribal court should address which court is best positioned to adjudicate the child-custody proceeding, not predictions about the outcome of the proceeding. 2016 BIA Guidelines at § F.5 at 49. We interpret the trial court's order to be a finding that under the circumstances of this case, it was "best positioned" to adjudicate the pending termination proceeding under the ICWA.[11] On this record, we cannot say that the trial court's determination was arbitrary and unreasonable, or made without regard for guiding legal principles or supporting evidence. *See Mejia,* 906 S.W.2d at 168. *See also In re*

---

[11] Because we decide this proceeding on the basis of which court is "better positioned" to adjudicate the underlying case, we find it unnecessary to discuss whether an "undue hardship" test should be applied to make the determination and whether the "advanced stage" of the case also warranted that jurisdiction remain in Texas. *See* TEX. R. APP. P. 47.1.

*Children of Shirley T.*, 199 A.3d 221, 230-31 (Me. 2019).[12]  Accordingly, we deny the

Navajo Nation's petition.

### CONCLUSION

The Navajo Nation's petition for writ of mandamus is denied.


Patrick A. Pirtle
Justice

---

[12] For example, the Iowa Supreme Court considered the denial of a motion filed by the Oglala Sioux Tribe in South Dakota to transfer child protection proceedings initiated in Iowa. *In the Interest of J.R.H.*, 358 N.W.2d 311, 317 (Iowa 1984).  The court upheld the denial on the ground that "[t]he bulk of the evidence and the majority of the witnesses will come from Iowa."  *Id.* at 317. *Accord People ex rel. T.E.R.*, 305 P.3d 414, 418-19 (Colo. App. 2013) (involving a transfer from Colorado to Michigan); *Tubridy v. Iron Bear*, 657 N.E.2d 935, 943 (Ill. 1995) (Illinois to Montana); *In re Interest of A.P.*, 961 P.2d 706, 712-13 (Kan. Ct. App. 1998) (Kansas to South Dakota); *In re Interest of Bird Head*, 331 N.W.2d 785, 790 (Neb. 1983) (Nebraska to South Dakota); *In re C.J.*, 108 N.E.3d 677, 695 (Ohio Ct. App. 2018) ("Good cause to deny transfer has been found where, as here, almost all the parties and witnesses reside in the county of the state court and have no contact with the tribal court."); *Chester County. Dep't of Soc. Servs. v. Coleman*, 399 S.E.2d 773, 775-77 (S.C. 1990) (South Carolina to South Dakota).